**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MASSACHUSETTS NURSES ASSOCIATION,** )<br><br>)<br><br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**BRIGHAM AND WOMEN'S HOSPITAL,** )<br>)<br>**Defendant.** )<br>) | **Civil Action No.**<br>**25-12211-BEM** |

**MEMORANDUM AND ORDER**
**ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**MURPHY, J.**

This is an action to compel arbitration.  Plaintiff Massachusetts Nurses Association (the "Union") brought this suit against Defendant Brigham and Women's Hospital ("Hospital"), alleging that the Hospital violated an agreement between the parties by reporting nurse Shannon Fagan to the Board of Registration in Nursing after discharging her for cause.  The Union asks the Court to declare the dispute arbitrable and compel the Hospital to arbitrate.  Before the Court now are cross-motions for summary judgment from the Union and the Hospital.  The Court finds that the relevant agreement is not fully integrated and that it may therefore consider extrinsic evidence.  Because the parties' different interpretations of that extrinsic evidence demonstrate a dispute of material fact, the Court will deny both motions for summary judgment.

## I.      Background and Procedural History

The Union and the Hospital are parties to a collective bargaining agreement (the "CBA") regulating the terms of employment of registered nurses employed by the Hospital.  Dkt. 14 at 3; Dkt. 15 at 3.  As of December 2023, Fagan was one of the nurses employed by the Hospital,

represented by the Union, and covered by the CBA. Dkt. 14 at 3; Dkt. 15 at 3–4. During that month, however, the Hospital determined she had engaged in workplace misconduct and considered terminating her employment. Dkt. 14 at 3; Dkt. 15 at 4. If the Hospital did terminate Fagan, the Union anticipated filing a grievance under the CBA challenging that decision. Dkt. 14 at 3. Facing the Union's anticipated grievance, the Hospital engaged in settlement negotiations with the Union and Fagan, instead of pursuing her termination. *Id.*; Dkt. 15 at 4.

During the negotiation process, the parties communicated in two relevant sets of emails. The first set of emails (the "First Email Chain") was preceded by a January 8, 2024 phone conversation between Roland Goff, an employee for the Union,[1] and Anita Holbrook, an employee of the Hospital, during which the Union contends Holbrook stated the Hospital would allow Fagan to resign if she self-reported to the Board of Registration in Nursing ("BRN"). Dkt. 14-1 ¶ 4. The Hospital disputes this characterization of the phone conversation. *See* Dkt. 14 at 5.

What is undisputed is that the First Email Chain began on Tuesday, January 9, 2024, at 2:34 p.m., in which Goff thanked Holbrook for a recent draft of the settlement and suggested changes. Dkt. 14-1 ¶ 5; Dkt. 16-3 at 3. Holbrook replied with an updated draft at 2:38 p.m. the same day. Dkt. 14-1 ¶ 6; Dkt. 16-3 at 3. Goff responded with "Thanks" at 2:40 p.m. Dkt. 14-1 ¶ 6; Dkt. 16-3 at 2. At 5:17 p.m. the same evening, Holbrook sent an email to Goff asking whether Fagan was self-reporting to the BRN. Dkt. 14-1 ¶ 7; Dkt. 16-3 at 2. Goff replied at 5:53 p.m. that he had informed Fagan the requirement to do so was "a condition of the settlement." Dkt. 14-1 ¶ 7; Dkt. 16-3 at 1–2. Holbrook replied at 5:54 p.m. that the Hospital "plan[ned] on reporting by Friday," January 12, 2024, which would give Fagan the following two days "to report herself." Dkt. 14-1 ¶ 7; Dkt. 16-3 at 1. Goff replied at 5:57 p.m. that the parties "need[ed] to have a signed

---

[1] Goff is now in-house counsel for the Union. *See* Dkt. 14-1 at 1; Dkt. 16 at 2.

agreement before [Fagan] reports." Dkt. 16-3 at 1.  The Hospital did not report Fagan to the BRN on Friday, January 12, 2024.  *See* Dkt. 14-1 ¶ 8; Dkt. 15 at 7.

Negotiations continued for another week.  Dkt. 14 at 5; Dkt. 15 at 6–7.  On Tuesday, January 16, 2024, Fagan told Goff that the Hospital had "discontinued [Fagan's] paid administrative leave and had instead deducted 36 hours from her paid vacation account." Dkt. 14-1 ¶ 9.  Goff subsequently called Holbrook and "protest[ed] this change in status."  *Id.*  Goff and Holbrook then engaged in additional email correspondence (the "Second Email Chain").[2]  Goff sent Holbrook an email at  1:23 p.m. stating that if the Hospital restored Fagan's vacation time, Fagan would sign the settlement agreement.  *Id.*  Holbrook replied at 1:24 p.m. that the Hospital would "change the vacation hours to admin leave in order to resolve the matter."  *Id.*

After the Second Email Chain, the Union, the Hospital, and Fagan that same day signed and executed a Memorandum of Agreement (the "Settlement Agreement").  Dkt. 11 at 13; Dkt. 14 at 5.  The Settlement Agreement designated Fagan's last day of employment as January 16, 2024, and discharged all claims that Fagan had against the Hospital except those unable to be discharged as a matter of law. Dkt. 11 at 2–3, 11–12.  The Settlement Agreement did not expressly reference Fagan self-reporting to the BRN.  *See* Dkt. 11 at 11–13; Dkt. 14 at 4.  It did, however, provide seven days from execution for Fagan to revoke her signature.  Dkt. 11 at 12–13; Dkt. 14–1 ¶ 9. She did not do so.  Dkt. 11 at 3; Dkt. 14-1 ¶ 10.

On January 17, 2024, the Hospital reported Fagan to the BRN.  Dkt. 14-1 ¶ 11; Dkt. 15 at 7.  As of February 6, 2024, Fagan had not self-reported to the BRN; she found out about the

---

[2] The Second Email Chain's text is not in the record.  However, the Union characterized a number of facts related to it as undisputed.  *See* Dkt. 14 at 5.  The Hospital did not respond to this characterization, *see* Dkt. 15 at 5–7, unlike the characterization of the phone call preceding the First Email Chain, which the Hospital disputed, *see id.* at 5. Additionally, the Hospital referenced the substance of the conversation and cited the Union's Declaration to do so. *See id.* at 10–11 (citing Dkt. 14-1 ¶ 9).  Accordingly, the Court treats the substance of the Second Email Chain as undisputed and references Dkt. 14-1 ¶ 9 for its substance.

Hospital's prior report that day.  Dkt. 14-1 ¶ 10; Dkt. 15 at 7.  The Union and Hospital engaged in further communications, but they broke down, leading to Fagan rescinding her resignation and the Union filing a grievance pursuant to the CBA.  *See* Dkt. 11 at 4; Dkt. 14 at 4–6.  After demanding arbitration and proceeding partway through the arbitral selection process, the Hospital asserted the matter was not "substantively arbitrable and that it would not arbitrate the matter absent a court order."  Dkt. 11 at 4; *accord* Dkt. 14 at 7.

The Union subsequently filed a motion to compel arbitration.  *See* Dkt. 1.  The Hospital opposed the motion while moving to enforce the Settlement Agreement.[3]  *See* Dkt. 11.  The Court treated the Hospital's combined opposition and motion as a motion for summary judgment, to which neither party objected.  *See* Dkt. 12.  The Union subsequently cross-moved for summary judgment.  *See* Dkt. 14.  The Court held a hearing on June 9, 2026, and took the matter under advisement.

## II.    **Standard of Review**

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Planning Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (internal quotation marks omitted).  "Facts are material when they have the potential to affect the outcome of the suit under the applicable law, and a dispute is

---

[3] The parties both construe the Agreement as a judicial settlement agreement. *See, e.g.*, Dkt. 11 at 6–8 (citing cases involving settlement agreements adopted by courts amidst litigation); Dkt. 14 at 12–13 (similar).  The Court has doubts about this construction, as the Agreement was signed to resolve a grievance process, rather than ongoing litigation before a court.  *See* Dkt. 11 at 2; Dkt. 14 at 3.  Such grievance settlements are normally treated as private settlements, *see Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am.*, 451 U.S. 679, 686–87 (characterizing a "contractual grievance and arbitration" process as "private rather than judicial resolution of [a] dispute[]"), so they are purely private contracts "generally not subject to judicial enforcement except in an action for breach of contract," *Disability L. Ctr. v. Mass. Dep't of Corr.*, 960 F. Supp. 2d 271, 284 (D. Mass. 2012) (noting that "a private settlement does not, ordinarily, receive court approval" (emphasis omitted)).  However, because courts "apply [to settlement agreements adopted by a court] the same basic rules that govern the interpretation of ordinary contracts," *Nault v. United States*, 517 F.3d 2, 4 (1st Cir. 2008), whether the contract at issue is a settlement agreement or not has no bearing on the substantive issues presented here.

genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 46–47 (1st Cir. 2019) (cleaned up). Accordingly, when examining a motion for summary judgment, a "court must examine the record in the light most favorable to the nonmovant and must make all reasonable inferences in that party's favor." *Viscito*, 34 F.4th at 83 (internal quotation marks omitted). A court may consider the whole "record—pleadings, affidavits, depositions, and admissions." *Doucette v. Jacobs*, 106 F.4th 156, 162 (1st Cir. 2024) (cleaned up). However, a court should not credit "conclusory allegations, improbable inferences, and unsupported speculation." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017).

"Where, as here, the parties cross-move for summary judgment, the court must examine each motion separately, drawing inferences against each movant in turn." *Viscito*, 34 F.4th at 83 (internal quotation marks and brackets omitted). "Since the issues raised by the cross-motions for summary judgment arise against the same legal backdrop, the discussion below will apply to both motions." *Del Gallo v. Parent*, 545 F. Supp. 2d 162, 173 (D. Mass. 2008).

## III.    Discussion

### A.    Applicable Law

The Union filed its motion to compel arbitration under 29 U.S.C. § 185 ("section 185"). *See* Dkt. 1 ¶ 1. The Supreme Court "has read . . . 29 U.S.C. § 185(a) . . . as vesting in the courts the power to develop a common law of labor-management relations," *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642–43 (1981), and the grant of authority extends to any "contract[] between an employer and a labor organization . . . in an industry affecting commerce," 29 U.S.C. § 185(a). "Because a grievance settlement is a contract between a union and an employer . . . , it's

a contract under" section 185(a).  *Olson v. Bemis Co.*, 800 F.3d 296, 301 (7th Cir. 2015).[4]  By the same token, this resolves any jurisdictional questions.  *See id.* at 296, 300–02 (concluding federal courts have subject matter jurisdiction over actions related to grievance settlements under section 185).  Accordingly, "the substantive law to apply . . . is federal law," rather than state law.[5] *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957); *see also Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC*, 994 F.3d 77, 85 (1st Cir. 2021) ("In a case . . . arising under federal law and brought in federal court, federal common law supplies the substantive rules of decision.").

"In construing the terms of contracts that are governed by federal common law, [courts] are guided by 'common-sense canons of contract interpretation.'"  *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995) (quoting *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989)).  "[F]ederal courts are [also] normally 'free to borrow from state law,' absent any conflict between federal interests and the borrowed state law."  *Commonwealth Sch.*, 994 F.3d at 85 (quoting *McCarthy v. Azure*, 22 F.3d 351, 356 (1st Cir. 1994)).  The Restatement (Second) of Contracts is a regular source of contract principles in developing federal common law.  *See, e.g.*, *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 180 (D. Mass. 2011) ("[F]ederal common law follow[s] the Restatement (Second) of Contracts to assess the rights of third-party beneficiaries."); *see also Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir.

---

[4] Other circuits have similarly concluded that a grievance settlement is a contract under section 185.  *See e.g.*, *Freeman v. Duke Power Co.*, 114 Fed. App'x. 526, 531 (4th Cir. 2004) ("Settlements of employee grievances that are entered pursuant to the terms of a CBA are labor contracts within the meaning of" Section 185); *see also Jones v. Gen. Motors Corp.*, 939 F.2d 380, 382–83 (6th Cir. 1991) ("The resolution of this claim will not involve the direct interpretation of a precise term of the CBA, but it will require a court to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a CBA.").  The Seventh Circuit noted in *Olson* that it was "not aware of any [Circuits] that have found otherwise."  800 F.3d at 301.

[5] Neither party appears to contest the conclusion that federal common law governs this agreement.  *See* Dkt. 11 at 7 (invoking federal common law caselaw); Dkt. 14 at 12 (citing the same cases).

1997) (characterizing "the principles of the Restatement (2d) of Contracts" as the body of law "from which [the court] would be inclined to fashion a federal common law rule" in a case concerning a Title VII settlement agreement). "In addition, part of determining a 'common understanding' of a term may include reference to dictionaries, though those definitions need not be controlling." *Parmenter v. Prudential Ins. Co. of Am.*, 93 F.4th 13 (1st Cir. 2024) (internal citations omitted).

### B.    Contract Interpretation

#### 1.    Contract Integration

The parties dispute whether the First Email Chain constitutes an additional term of the Settlement Agreement. *See* Dkt. 11 at 8; Dkt. 14 at 13–16; Dkt. 15 at 9. Although not framed as such, this is a prototypical case of contract integration. *See* Restatement (Second) of Contracts §§ 210, 216 (1981) (discussing the difference between complete and partial contract integration and its effect on terms extrinsic to the contract).

Under federal common law, "[w]hether a writing is fully integrated is generally a question of law to be resolved by a court." *Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 44 n.10 (1st Cir. 2008) (quoting *Merk v. Jewel Food Stores Div. of Jewel Cos., Inc.*, 945 F.2d 889, 893 (7th Cir. 1991)), *aff'd in part, rev'd in part on other grounds and remanded sub nom.*, *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. 175 (2010)); *see* Restatement (Second) of Contracts § 210 (1981). "If a writing is only partially integrated, evidence of prior or contemporaneous agreements is admissible to supplement its terms though not to contradict it. If an agreement is completely integrated, however, not even evidence of a consistent additional term may be introduced to elucidate the writing." *Merk*, 945 F.2d at 893 (internal quotation marks omitted); *see also* Restatement (Second) of Contracts §§ 213, 215, 216 (1981) (similar). To determine whether an agreement is completely or partially integrated, "[a]greements and

7

negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence." Restatement (Second) of Contracts § 214; *see also Kerkhof v. MCI WorldCom, Inc.*, 282 F.3d 44, 50 (1st Cir. 2002) ("[E]xtrinsic evidence is often admitted for the purpose of showing that a seemingly complete agreement is not so intended.").

There is strong evidence that the Settlement Agreement is not fully integrated. First, the Settlement Agreement does not contain an integration clause. *See* Dkt. 11 at 11–13. Presence of an integration clause is a "good hint" that the parties, intended it to be fully integrated. *See Guldseth v. Family Medicine Assocs. LLC*, 45 F.4th 526, 535 (1st Cir. 2022) (applying Massachusetts law). Courts interpret contracts between "sophisticated business entities," like those here, "fairly literal[ly]." *AccuSoft Corp. v. Palo*, 237 F.3d 31, 41 (2001) (quoting *AMF Inc. v. Jewett*, 711 F.2d 1096, 1101 (1st Cir. 1983)) (applying Massachusetts law). Second, "[n]either the Union nor [the Hospital] denies the existence of an additional [written] term to the contract"—the Second Email Chain. *Merk*, 945 F.2d at 893; *see* Dkt. 14 at 5; Dkt. 15 at 10–11 (citing Dkt. 14-1 ¶ 9). "Because both sides concede that there was an additional [written] term to their contract, it necessarily follows that the written terms of the [Settlement Agreement] did not represent a full integration." *Id.* Therefore, the Second Email Chain, combined with the lack of an integration clause, leads the Court to conclude that the Settlement Agreement is only partially integrated and may be supplemented by prior consistent terms.

Even still, the Hospital argues that the CBA prohibits an additional term from supplementing the Settlement Agreement, citing language that says: "no other agreement between the [Union and Hospital] shall be effective unless embodied in a written agreement executed by both parties." Dkt. 11 at 8 (quoting Dkt. 7 at 110). The essential thrust of the Hospital's argument is that *the CBA* requires the *entirety* of any non-CBA contract between the Hospital and the Union

to be written down.  That, however, is not a fair reading of the CBA.  The relevant provision the Hospital points to is an "Entire Agreement" clause.  Dkt. 7 at 110.  Understanding that provision in its context, *see Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 31 (1st Cir. 2022) ("[A]n inquiring court must avoid tunnel vision: instead of focusing myopically on individual words, it must consider contractual provisions within the context of the contract as a whole."), the "Entire Agreement" clause does not control questions of contract law in other permissible contracts made between the parties, *cf. Tompkins v. Sullivan*, 313 Mass. 459, 461 (1943) (applying Massachusetts law, and noting that "[t]he rule that when parties have reduced their contract to writing, all previous or contemporaneous oral or written agreements are merged in it, does not apply to the collateral or independent agreement in the case at bar").  Accordingly, the Court concludes that while CBA does require that any additional contract between the Union and the Hospital be set out in writing, it does not require that the additional contract be fully integrated. And, as the Settlement Agreement *was* adopted in writing, *see* Dkt. 11 at 11–13, and neither party disputes that it is distinct from the CBA, *see* Dkt. 15 at 9, the CBA's "Entire Agreement" clause does not bar supplementation of the Settlement Agreement's terms via extrinsic evidence.

Thus, the Court finds that the Settlement Agreement is only partially integrated and that extrinsic evidence, including the First Email Chain, may be used to supplement the terms of the Settlement Agreement.[6]

### 2.    Interpretation of the First Email Chain

Integration alone does not resolve the case.  The Hospital and Union also dispute the meaning of the First Email Chain.  Dkt. 1 ¶ 13; Dkt. 15 at 9–12.  Under federal common law, when

---

[6] The First Email Chain's term, whatever its precise meaning, does not contradict any term in the Agreement. *See* Dkt. 11 at 11–13; Dkt. 16-3 at 1–2.

an agreement is "found not integrated as a matter of law," the "precise" parameters of any supplemental terms present a "factual question." *Merk*, 945 F.3d at 893; *see also* Restatement (Second) of Contracts § 212(2) (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.").

Here, the First Email Chain necessarily turns on the substance of the preceding January 8, 2024 phone call. The parties dispute the substance of that phone call, which leads to competing interpretations of the First Email Chain. Construed favorably to the Union, the phone call and First Email Chain indicate that the Hospital agreed to provide Fagan with the opportunity and reasonable time to self-report. Dkt. 14-1 ¶ 4; Dkt. 16-3 at 1–2; Dkt. 14 at 14–15. Construed favorably to the Hospital, the phone call and First Email Chain allowed the Hospital to report Fagan upon the signing of the Settlement Agreement. *See* Dkt. 14 at 5; Dkt. 16-3 at 1–2; Dkt. 15 at 9–12. As the meaning of the First Email Chain is in dispute, and as the remaining contested questions—such as whether the First Email Chain's terms were material and whether the Hospital breached, *see* Dkt. 14 at 16–18; Dkt. 15 at 9–12—depend on the precise interpretation the phone call and First Email Chain, the Court concludes that there is a genuine dispute of material fact such that summary judgment is inappropriate.

## IV.    Conclusion

For the foregoing reasons, the Hospital's motion for summary judgment is DENIED. The Union's cross-motion for summary judgment is also DENIED.

**So Ordered.**

/s/ Brian E. Murphy

Brian E. Murphy

Dated: June 12, 2026                                Judge, United States District Court

10